**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and PINSON, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT.  ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**February 18, 2022**

# In the Court of Appeals of Georgia

A21A1215. BELL v. THE STATE.

MERCIER, Judge.

A jury found Cortney Bell guilty of murder in the second degree, cruelty to children in the second degree, and felony contributing to the dependency of a minor, in the death of her two-week-old daughter.[1] The trial court denied Bell's motion for new trial, and she now appeals, asserting that the evidence was insufficient to support the verdicts. For the following reasons, we conclude that the evidence was insufficient as to second-degree murder and second-degree cruelty to children. However, we find the evidence sufficient to sustain Bell's felony conviction for

---

[1] Bell was jointly tried with the victim's father, Christopher McNabb. The jury found McNabb guilty of malice murder and other crimes in the death of the victim. His appeal is currently pending in the Georgia Supreme Court. See Case No. S22A0031.

contributing to the dependency of a minor. Accordingly, we affirm the judgment in part and reverse it in part.

The evidence, viewed in support of the jury verdict, showed that Bell lived in a mobile home park in a trailer rented for her by her father. Approximately three weeks after Bell moved into the home, her boyfriend Christopher McNabb moved in with her. On September 23, 2017, Bell gave birth to the victim without any complications, although the victim was born a few weeks preterm. The victim was discharged from the hospital four days later. McNabb was the victim's father and the father of the victim's two-year-old sister C. M.

On October 1, 2017, when the victim was eight days old, Bell left the victim and C. M. at the home of her cousin Megan Sorrells, along with a diaper bag. Sorrells explained that Bell always had bruises on her and that there was "some violence going on between" Bell and McNabb. She explained further that Bell knew the children would be safe with her, "out of the chaos and the argument," and away from Bell and McNabb's drug use.

Two days later, however, on October 3, Sorrells told her mother she was "tired with all the kids, with her four [children] and [the victim and C. M.]," and her mother contacted Bell's father (hereinafter, "the grandfather"). The grandfather went to pick

2

the girls up from Sorrells because Sorrells had four children of her own and did not need the burden "of trying to look after two more babies." When he arrived, he put C. M. in his car and told Sorrells he would be back for the victim. The grandfather explained that he then went to Bell's home to retrieve a car he had lent her because he was told that Bell and McNabb were "doing drugs . . . heavy drugs," but when he arrived, McNabb "took off running up the hill," and Bell took C. M. out of his car. The grandfather then went back to Sorrells' home to retrieve the victim.

Bell and McNabb told the grandfather that they were going to have him arrested for taking the victim. The grandfather called 911 to report that he was taking the victim and keeping her with him because Bell and McNabb had abandoned the children. At trial, he explained that he was concerned for the children's welfare and that Bell and McNabb were using methamphetamine. The 911 dispatcher told the grandfather that officers were at Bell's home.

Bell had also called 911 and reported that the grandfather had taken the children without her permission. The deputy who arrived at Bell's home in response to the call told Bell to allow the grandfather to keep the victim for a while to "let things cool off," and that as long as the victim was safe, there was no reason to bring her back. Bell also complained to the deputy that the grandfather had picked up the

3

car he lent to Bell and would not return it. Both Bell and McNabb asked the grandfather to return the car in exchange for him having the children. The deputy noticed that Bell had a fresh black eye, and when he asked Bell about it, she refused to "tell [him] where she got it from." At some point, Sorrells' mother took C. M. back to her grandfather.

Two days later, on October 5, 2017, the grandfather picked Bell up and took her to his home so that she could see the children. He took her back home later that day. The grandfather told Bell "that she needed to clean the house up and get the house in order before [he] would bring the babies back." He explained that there were "clothes here and clothes there and dishes in the sink" at Bell's home, but that she "cleaned up the trailer" by Friday afternoon, October 6. The grandfather took the children back to Bell's home that day around noon, and he supplied Bell with "milk and diapers." He testified that when he returned the children, there were no injuries to the victim's body, head, or face, and that he had never seen any signs of abuse on either the victim or her sister. When the grandfather arrived at Bell's home, McNabb was hiding behind a tree. He explained that he and McNabb "never got along much," and that McNabb would avoid him when he came to Bell's home.

On October 6, the same day the grandfather returned the children to Bell, another one of Bell's cousins, Craig Weatherford, arrived at her home around 8:00 p.m. to smoke methamphetamine with Bell and McNabb. Weatherford stayed only for about 15 minutes and saw that the victim was in the back bedroom in her bassinet. He stated that he went into the bedroom to see the victim and that while he was looking at her, Bell and McNabb came "back there and they [were] being loud and I was like y'all be quiet and that was it and I left."

On the morning of October 7, around 9:30 a.m., the grandfather received a call from Bell telling him that the victim was missing and asking him if he had the victim. The grandfather told Bell that he did not have the victim and to call 911. Bell also contacted her friend Melissa Davis around 10:00 a.m., sending her a text message that "the baby is gone." Davis went to Bell's home and found McNabb standing on the porch. McNabb told Davis "they're going to think I did this. . . . the baby is gone." Davis told McNabb to "calm down" and helped Bell "look[ ] up under clothes and stuff" for the victim. Davis "asked [Bell] had she called the police yet and she said no. And I just felt like something wasn't right . . . and I left." At 10:38 a.m., as Davis was leaving, Bell called 911. She told the dispatcher:

5

I just woke up. My daughter woke me up on the couch. Um, I have a two-year-old and I have a two-week-old, and my two-week-old is not in her [bassinet]. Her paci is on the floor. . . . She's not in her [bassinet]. She's not here. I've looked everywhere. I've looked under clothes and everything. . . . My child said – my two-year-old said she's gone. And I've looked everywhere in the house[.]

The dispatcher asked Bell, "You and the dad both were asleep and/or he just came back home?," to which Bell responded,

No, me and him woke up together. [C. M.] woke us up together . . . [a]nd she was kind of freaked out. I mean, it – I don't – I don't know, because she was just standing there beside the couch in the corner. And I told her, come here. And I loved on her, and then I told my baby's dad to go check on [the victim]. And then he's talking about she's not here, she's not in here.

Bell explained further that the last time she was with the victim was at 5:00 a.m. and that McNabb had just left to look for the child.

Deputies arrived at Bell's home at around 10:58 a.m. The grandfather arrived soon after and joined others in looking for the victim. Bell told deputies that McNabb received a text message from his father around 9:30 a.m. and "at that time, the children were okay." She explained that around 10:30 a.m., C. M. "woke her up upset

and said Sissy gone." Bell said that she had last seen the victim when she and McNabb fed her around 5:00 a.m.

One of the deputies noted, and body camera video shows, that Bell would be "calm, collected, and then as she began describing what happened to the [victim], . . . she'd start to panic a little bit and then she would go right back down to being calm and collected." Bell told the deputy that McNabb "was out looking for the [victim]" in a wooded area near the home. The deputy and other law enforcement officers who had arrived on the scene searched both the inside of the home and the surrounding area outside, and they noted that there were no signs of forced entry into the home. They also noted that there were no signs of "any type of trauma" in the bedroom where the victim and C. M. had been sleeping. A neighbor told one of the deputies that she noticed the door of Bell's home was open "all morning . . . for at least a couple of hours," and that she saw someone come out onto the porch and then go back inside.

Approximately 20-30 minutes later, McNabb appeared coming from the direction of a nearby highway. He was "soaking wet" with muddy feet, had "green stuff" on him from walking in the woods, and was extremely nervous. McNabb told a deputy that he had gone into the woods to look for the victim. One of the deputies

noticed that McNabb was "fidgeting, like going in and out his pockets, looking . . . left, looking right." McNabb pulled out a flashlight, indicating that he had used it while looking for the victim, even though it had been daylight since about 7:40 a.m.

Additional officers and investigators, as well as K-9 units, were called to the trailer park to help search for the victim, to no avail. Law enforcement officers remained at the scene until around 9:00 p.m. and then called off the search for the day.

Bell and McNabb were separately transported to the sheriff's office and separately interviewed after being advised of their *Miranda* rights. They were not placed under arrest and voluntarily gave statements to police.

Bell told investigators that the night before, the victim and C. M. slept in the bedroom while she and McNabb slept in the living room on the couch. She stated that the victim woke up at 5:00 a.m., and that she and McNabb got up and changed the victim's diaper, fed her, and then dressed her in a purple "onesie" and orange and blue pajamas. Bell explained that she went back to the living room while McNabb put the victim in her bassinet, and that she and McNabb then fell asleep on the living room couch. Bell stated that while she was still asleep, McNabb woke up around 9:30 a.m. when he received a text message from his father. He then "checked on both

8

babies, and they were there," went back to sleep, and around 10:15 or 10:20 a.m., C. M. woke both of them up "acting weird" and "whining." When she asked C. M. "where's [the victim]; [C. M.] said, gone." McNabb then went to the bedroom and told Bell that the victim was not there. Bell first thought that C. M. moved the victim as she had done several times before, "[b]ut after looking, [she] couldn't find [the victim] anywhere." Bell said she noticed that a plastic storage bin containing clothes had been moved from beside the victim's bassinet to the bed. She explained further that the orange and blue pajamas she had dressed the victim in over her purple onesie were in the bathroom and that she assumed that "maybe [the victim] was hot . . . so [McNabb] took [the pajamas] off."

Bell explained to investigators that she had not found the blue blanket that was inside the victim's bassinet and that the victim's pacifier was on the floor. She told them that she and McNabb looked everywhere in the home for the victim and McNabb "ran around the trailer. He looked up under the trailer. Then he said he was going to stroll the neighborhood and see if he could find anything of her or . . . anything that would give him an idea of where she was." After looking all over the home, she called Davis and the grandfather. Bell was uncertain whether the doors to the home had been locked. She told investigators that she did not know anyone who

9

would have taken the victim, but explained that McNabb "got into a fight with a dude like a month and a half ago" and that they had someone break into their home through a window. Bell also explained that about a week prior, she had a physical altercation with a woman with whom McNabb had been intimate. She claimed that she and McNabb were "not on drugs," she had not smoked marijuana in six weeks, and the "last time [she] did meth was over three years ago." Bell explained that she left the victim and C. M. at Sorrells' home because she "needed a mommy break."

In his interview with investigators, McNabb stated that around 9:30 a.m. that morning, he woke up because he received a text message from his father concerning money to pay rent. He explained that he then went back to check on the children and they were both asleep. McNabb stated that he went back to sleep and then woke to Bell asking C. M. "what's wrong, baby, what's wrong." He explained that Bell told him to go check on the victim, and that when he "got halfway down the hallway" he realized that the victim was not in her bassinet. He first thought C. M. had picked the victim up because C. M. had a "bad habit of picking her up and . . . trying to carry her around," but then he realized that the victim was not in the room. McNabb explained further that he and Bell then "started tearing the house up . . . looking for [the victim]." He went outside while still in his underwear to look around and under the

10

trailer. At some point, McNabb put on clothes and continued to search the home for the victim. He stated that he told Bell that he was going out to look for her because he "figured . . . if somebody would have got her walking, they would have [gone] through the woods." McNabb stated that he did not know anyone who would take the victim, but that someone named Mathew Lester was the only person who would feel any ill will toward him because he had an altercation with Lester in September, the same altercation Bell mentioned in her statement to investigators.[2] McNabb also noticed that the plastic storage bin that was next to the victim's bassinet had been moved to the bed. When asked when was the last time he and Bell has used drugs, McNabb stated that Bell had not used drugs in almost three years and that he smoked marijuana two weeks prior.

At the end of their interviews, Bell and McNabb were placed in a room together, and the following colloquy took place:

McNabb: I love you.

Bell: . . . She's no where in the house.

---

[2] The State admitted evidence that Lester was in jail from October 2 to October 17, 2017.

. . .

Bell: They searched the house with dogs and she's never there. They got cadaver dogs in the woods, and they still can't find her.

McNabb: Shhhhhh. I love you.

Bell: I love you too.

McNabb: It's ok.

Bell: It's not ok.

McNabb: We're gonna to find her. We're gonna find her.

. . .

McNabb: He asked me – He was asking if you asked me anytime this morning . . . did I have anything to do with it. I told him you asked me.

Bell: I told him I asked you, because they were asking me if you had something to do with it. I told them you didn't.

McNabb: . . . He was trying to make it some kind of accident like when it happened like one of the[ ] [bins] falling on her or something. And he asked me if I thought that you would, if I thought you had some kind of accident or whatever; and I said if she did have an accident, if she would

12

have had an accident, she would have never hid it. She would have known.

. . .

McNabb: She would have known it was an accident.

. . .

Bell: I just don't know what to think right now. She's gone. She just f[***]ing disappeared.

McNabb: . . . I didn't do anything and I know you didn't do anything. I can't afford to be charged with murder. . . .

Bell: You just went outside.

McNabb: Hmm?

Bell: . . . I love you baby. I just want her to come home. . . .

McNabb: You got to keep you head up. . . . You just gotta be strong.

Bell: I can't be strong anymore.

. . .

Bell: I didn't do sh[**]. I was asleep, and I woke up and she was gone.

13

McNabb: I know.

. . .

McNabb: They gonna try and play us against each other.

. . .

Bell: . . . [S]he's gone. I moved that [bin], and it was on the bed.

. . .

Bell: [Where] did she go?

. . .

McNabb: I loved - I love her. She was my baby.

Bell: Calm down. Why did you just do that?

McNabb: Do what?

Bell:

Why did you just do that?

McNabb: Why did I just do what?

Bell: You just said loved.

McNabb: I don't know . . . . Where is she? . . . You think I had something to do with this sh[**]?

Bell: In my heart, no. I just hope you haven't. My heart tells me no.

. . .

Bell: I just want my baby.

McNabb: I know. I love you so much.

Bell: I love you.

. . .

Bell: Who would come in a house and take our baby?

McNabb: . . . I don't know. That's all I can say is, I just don't know.

Following their interviews with police, Bell and McNabb spent the night at Weatherford's home. Weatherford asked Bell and McNabb to make a list of the people who had been in their home. Before they went to bed, Bell, McNabb, and

15

Weatherford went out to look for the victim and to speak with some of the people Bell and McNabb named.

The next day, several citizens joined in the search. At some point, a citizen in the search party found a jacket, a "drug bong," and an empty wallet.[3] Another citizen in the search party was walking the wood line near the trailer park when she came to a clearing and noticed a log that looked out of place. The log was sitting over a big open hole. She noticed that the log was unusual in "the way it was sitting, and under the log was a pile of sticks and twigs up underneath it. I had picked up one of the sticks and began to move away some of the leaves, and that's when I saw the black string." The citizen pulled the string up with a stick to find that it was attached to a blue and red drawstring bag with a Michael Jordan logo on it. Law enforcement officials were informed of the discovery and an investigator was called to the area. A deputy noted that the bag, which was found about 856 feet from Bell's home, was

---

[3] Some of these items were disposed of by McNabb after the altercation with Lester. Lester came to Bell's home to use drugs with McNabb, Shane Kidd and another man in September 2017, several days before the victim was born. At some point, McNabb became angry with Lester, attacked him with brass knuckles, and threw him out of the home. Bell and C. M. were sitting in the car when this occurred. McNabb admitted to later taking Lester's belongings to the woods along with his own drug paraphernalia he wrapped in a jacket he found, for fear that Lester would call the police. Both Bell and McNabb mentioned this altercation in their statements to investigators.

wet and that it had rained the night before. Inside of the bag was a "Varsity" restaurant t-shirt, a pair of blue and black "camouflage-type" men's boxers, a small child-size light blue t-shirt, and the body of the victim wrapped tightly in a blue blanket. Certain that the victim was deceased, the investigator called the coroner.

The coroner arrived and transported the bag to the medical examiner's office. The blue blanket the victim was wrapped in had "blood-type stains" on it and under the blanket was a gray sleeveless adult t-shirt with "one of the arm holes . . . wrapped around [the victim's] neck and covering her head." She was wearing a purple onesie and a diaper. An autopsy revealed that the victim died of "blunt impact injury" to her head. She had numerous fractures to the top and base of her skull, bruising to her left cheek and left jawline, and the upper palate of her mouth was lacerated from front to back. She also had a cut underneath one of her eyes that looked like it was made by a sharp object. The victim's "deciduous teeth" – teeth that had not yet erupted from her gums – "had come out because of the laceration to the upper gums" and could be seen from her mouth. The pathologist concluded that the victim's injuries were

"contemporaneous" and that she "sustained this extensive head trauma and then died . . . rapidly."[4]

Bell was riding in a car with her mother, McNabb, and two others, en route to Bell's home when Bell's aunt called Bell and told her that the victim's body had been found.[5] Bell's mother explained that when the call came, everyone in the car "just freaked out, kind of started screaming," and that she told McNabb "to get out of the car because [she] was afraid that guns were going to be put on the car" and a child was in the vehicle with them. They stopped at a red light, McNabb said "they are going to think it's me" and jumped out of the vehicle. Bell asked the driver to stop in a neighborhood that is known for methamphetamine, but the driver took Bell to her home.

---

[4] A pediatrician noted from victim's visit several days before her body was found that her right foot was slightly turned in and that she had a "small patch of bluish discoloration on [her left] cheek." But the pathologist testified that neither of these caused her death. She testified further that the victim had no preexisting injuries, i.e., no healing bruises or healing broken bones. There was no evidence presented that either the victim or her sister had been physically abused before the victim's death.

[5] Weatherford had also texted Bell to inform her that the victim's body had been found.

Meanwhile, a law enforcement officer went to Bell's home to locate Bell and McNabb to inform them that the victim's body had been found. No one was at the home, but Bell arrived about 3:15 p.m. She was crying and upset. The officer asked Bell if she had heard that the victim's body had been found, describing the exchange as follows:

> I said are you aware and she said yeah, I got a text that they found -- found the baby in the woods. And so I said are y'all missing a backpack or anything? And she said yeah, my husband has one, hasn't seen it in a couple of days. And I said describe it to me and she said it's a drawstring type backpack and it's a Nike, it's blue on one side with a red emblem and red on one side with [a] blue emblem on it. And she said he keeps -- my husband, McNabb keeps it with him all the time, he carries his clothes in it, but she hasn't seen it in a couple of days. And I said well, where is he? And she said well, we [were] in the car and when I got the text that they found baby in the woods, he jumped out of the car and said they are going to blame [him] for it and took off running, so we drove on here.

Bell was again transported to the sheriff's department where she waived her *Miranda* rights and gave a statement. The corporal described Bell as "cooperative . . . she wasn't evasive," and that she went willingly. In this second interview, Bell recounted the same series of events she did in her first interview. But she admitted for

the first time that she used "weed and meth," and that McNabb had physically abused her: "I lied to y'all yesterday when I said he hadn't hit me. I have had bruises on my back and my sides. I have bruises everywhere, all over my arms and legs . . . [h]e hits me all the time." Bell stated that she believed someone had come into her home and taken the victim with "all of the people [McNabb] had in and out of there." When asked what McNabb was wearing the morning of October 7 around 5:00 a.m. (when she and McNabb fed the victim and changed her), Bell stated that he was wearing "blue camo boxers" and that he might have changed into green boxers at some point later that morning before getting dressed to go look for the victim. Bell was unaware at the time she made this statement that blue camouflage boxers were found in the bag with the victim's body.

Later in the evening, McNabb went into a convenience store and told the clerk that he had been running "because the cops [were] on [his] trail." When the clerk asked him why, McNabb told her "that was my baby." The clerk, who remembered seeing McNabb in the store the day before and had heard about the missing victim, called 911. McNabb purchased a drink and told the clerk, "I didn't do it. I didn't do it. I swear I didn't do it," as he turned to leave the store. According to the clerk: "I said well, then you need to tell them. He said y'all are going to be surprised. I said,

20

I am not going to be surprised, but if you didn't do it and you know who did, you need to tell it." She explained that McNabb was wet and dirty, as if he had been in the woods, and "[k]ind of hyper." A customer who was in the store at the same time testified that McNabb said he had been in the woods for two days.

A corporal with the sheriff's department responded to the 911 call from the convenience store. He was told that McNabb had gone in the direction of an automated car wash. The corporal found McNabb hiding on the back side of the car wash and placed him under arrest without incident.[6] McNabb was "[s]oaking wet . . . from head to toe" and had grass and leaves on his clothing and shoes. McNabb had been "on the run for approximately eight hours" when he was arrested.

In his second statement to law enforcement officers, McNabb told investigators that he jumped out of the vehicle when he was told the victim's body was discovered because he "got scared" and "felt like [he] was being accused anyway." And contrary to his statement the day before that he had only used marijuana two weeks prior, McNabb stated that he used methamphetamine every day, including the night before the victim disappeared from the home. He also stated that Bell smoked a "[p]iece of

---

[6] McNabb was not arrested for the victim's death at this time, but was arrested for a probation violation.

a joint" that night, but denied that she smoked methamphetamine with him. McNabb admitted that he had hit Bell before, most recently a few weeks prior. And, he stated for the first time that as he fed the victim around 5:00 a.m., he took her outside on the front porch for a while and then brought her back inside, finished feeding her, put her in her bassinet, and put her pacifier on top of her.

On October 11, 2017, McNabb, still in jail for a probation violation, was charged with murder and other crimes related to the death of the victim. Two months later, an investigator received a message from McNabb that he wanted to speak with him. McNabb was brought to an interview room for yet a third interview after waiving his *Miranda* rights. He admitted taking Lester's belongings to the woods and stated that the drug paraphernalia found belonged to him. McNabb claimed that he heard a rumor that his friend Shane Kidd killed the victim, asserted that the killer had to be someone who had been to his home, and began naming some of those individuals. He suggested that law enforcement officers question citizens who were in the search party and that someone must have taken the victim from the home and then later placed her body in the woods after officers initially searched the area; and, he questioned why the K-9s did not locate the victim earlier in the search. McNabb told the investigator that "supposedly somebody very important put a hit out on

[him]." He stated that he had been informed that the victim was found in a "Jordan" bag and admitted that the bag was his. McNabb explained that he often carried drug paraphernalia and clothes in the bag, and that the bag and the "Varsity" restaurant t-shirt would have been in the plastic storage bin containing his clothes next to the victim's bassinet (which had been moved to the bed when the victim was discovered missing), but that the last time he had the bag, he emptied it. McNabb claimed that he had nothing to do with the victim's disappearance and death. He explained:

> I know deep down inside that when it's all said and done, that methamphetamine is going to be the reason why my child ended up dead. Because it was somebody that was coming around, and everybody that was coming around was coming around because of methamphetamine. In the end, I feel like it's all going to come around in a big circle and be methamphetamine as the root of the problem. That's what I feel. Whoever did it is a meth head.

When asked if Bell killed the victim, McNabb replied, "No."

Bell was subsequently arrested on January 7, 2018, and charged with second degree murder, second-degree cruelty to children, and contributing to the dependency of minor. She waived her *Miranda* rights and was again interviewed by investigators. In this third interview, Bell again insisted that she had nothing to do with the victim's disappearance and death. After the investigator explained the charges against her,

23

Bell stated that she should only be charged with "improper care and the things that had been going on in the household" and admitted that she was "guilty of somewhat neglect because [she] did drugs." But she was adamant that she "was a good momma . . . trying the best that [she] could," and that she "loved [her] babies." Bell asserted, as she did in her two prior interviews, that she was asleep and when she awoke, the victim was gone. She again admitted that she was not initially truthful about her and McNabb's drug use and the fact that McNabb physically abused her. But she explained further that McNabb had never abused the children.

Kidd testified that McNabb sent him a message around 7:41 a.m. telling Kidd that he was "wigging and tripping and needed to get out of there for a little while," and that less than an hour later McNabb sent him a message that "he couldn't find the baby." However, investigators were unable to locate a record of these messages.

On October 20 and December 11, 2017, McNabb made phone calls to Bell from the county jail. In those calls, Bell accused McNabb of killing the victim. McNabb repeatedly denied any wrongdoing and suggested that someone took the victim from their home and was trying to blame him.

Following the presentation of evidence, the jury found Bell guilty on all three counts of the indictment. The trial court merged the second-degree cruelty to children

24

count into the second-degree murder count and sentenced her to 30 years, with 15 years to serve in prison and 15 years on probation. For contributing to the dependency of a minor, the court sentenced Bell to another 10 years of confinement to run concurrently with the sentence for second-degree murder. The trial court denied Bell's motion for new trial, and this appeal followed.

In her sole claim of error, Bell asserts that the evidence was insufficient to support the guilty verdicts. When this Court reviews the sufficiency of the evidence

> the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Landell v. State*, 357 Ga. App. 207, 208-209 (1) (850 SE2d 419) (2020) (citation, punctuation, and emphasis omitted); see *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). The evidence presented here was circumstantial. And "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. Further, "[e]very

25

person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a).

> A person is concerned in the commission of a crime only if he: (1) Directly commits the crime; (2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity; (3) Intentionally aids or abets in the commission of the crime; or (4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

OCGA § 16-2-20 (b). And "[w]hether a person is a party to a crime may be inferred from that person's presence, companionship, and conduct before, during, and after the crime." *Cisneros v. State*, 299 Ga. 841, 847 (2) (792 SE2d 326) (2016) (citation and punctuation omitted).

1. *Murder in the second degree.* Bell argues that the evidence was insufficient to establish that she "caused the massive trauma to [the victim's] head," either directly or as a party to the crime. We agree.

OCGA § 16-5-1 (d) provides: "A person commits the offense of murder in the second degree when, in the commission of cruelty to children in the second degree, he or she causes the death of another human being irrespective of malice." And a person commits cruelty to children in the second degree "when such person with

26

criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (c). "Criminal negligence is an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby." OCGA § 16-2-1 (b).

The indictment charged Bell with second-degree murder for "caus[ing] the death of [the victim] . . . while in the commission of cruelty to children in the second degree, *by causing said [victim] . . . cruel and excessive physical pain through the infliction upon her of blunt force trauma to her head*, in violation of OCGA § 16-5-1 (d)." (emphasis supplied). The State argues that, with regard to each crime, Bell's acts of leaving the victim at her cousin's home for two days; using methamphetamine (that would interfere with her ability to care for the child); and allowing the victim to remain in a home with an "extremely volatile" McNabb who also used methamphetamine, assaulted Bell on multiple occasions, and "beat up Mathew Lester with brass knuckles" were sufficient to support the guilty verdicts. But none of these acts show that Bell caused cruel and excessive pain to the victim by inflicting blunt force trauma to her head, as alleged in the indictment, or that she aided and abetted in the crime.

27

The facts here are similar to the facts in *Glenn v. State*, 278 Ga. 291 (602 SE2d 577) (2004). In *Glenn*, a three-week-old child lived with her mother and the mother's boyfriend, and "appeared normal" late one night when the mother's sister visited. Id. at 292 (1). Around 3:00 a.m. the next morning, the boyfriend woke the mother and told her that the child was having trouble breathing. Id. at 293 (1). The child was taken to a hospital where she later died. Id. In support of the charges against the mother for felony murder, cruelty to children, and aggravated battery, the State presented evidence that the mother allowed the boyfriend to care for the child even though she had been told that he may have been responsible for an earlier injury to the child's leg and may have been abusive toward other babies. Id. at 294 (1) (b). The State also pointed to evidence that the mother failed to participate in the emergency room discussion. Id. The Georgia Supreme Court reversed the mother's convictions, finding that the State was required to prove beyond a reasonable doubt that the mother

> intentionally assisted, aided, abetted, encouraged, or otherwise concerned herself in the abuse of [the child], not that she did so inadvertently . . . There was absolutely no evidence showing that [the mother] intentionally assisted [the boyfriend's] abuse of [the child] in any way. Further, the State failed to exclude the reasonable hypothesis that [the boyfriend] injured the baby while [the mother] slept unaware

28

in another room in the house, and that [the mother] failed to participate in the emergency room discussion because she did not know what had caused [the child] to stop breathing.

*Glenn*, supra at 294-295 (1) (b).

Similarly, in *Johnson v. State*, 269 Ga. 840 (506 SE2d 374) (1998), the Georgia Supreme Court reversed the felony murder conviction (predicated on cruelty to children) of an uncle who was present in the house the night his infant nephew was beaten and killed. Id. at 840-841. The uncle was sleeping downstairs and the child was in the same bedroom with the parents when a neighbor heard crying and a "thump" around 3:00 a.m. Id. at 841. An hour later the neighbor heard the uncle saying "I didn't do it," and two hours later the uncle called the police and told them the child was not breathing. Id. On appeal, the Supreme Court concluded that although the evidence showed that the uncle had witnessed the father's prior abuse toward the child and was uncooperative in the investigation, there was no evidence the uncle abused the child, and the State's case against him was based entirely on circumstantial evidence. Id. at 842-843. The court concluded that the State failed to exclude the reasonable hypothesis that the uncle was sleeping downstairs and unbeknownst to him, the parents beat and killed the child. *Johnson*, supra at 842-843.

Here, the evidence showed only that Bell last saw the victim when she and McNabb changed her diaper and fed her around 5:00 a.m., that she went back to the living room and left McNabb to put the victim to bed in her bassinet, and that when C. M. woke her up around 10:30 a.m., the victim was missing. The victim's body was found a day later in the woods near the home in McNabb's gym bag with some of his clothing, and it was determined that she died from blunt force trauma to her head. Although Bell initially told investigators that she did not use drugs and that McNabb did not physically abuse her, her several statements regarding what occurred the day the victim was taken from her home were consistent, and she was cooperative with investigators. Just as in *Glenn* and *Johnson*, the State "offered nothing to discount the reasonable possibility that [Bell] did not contribute to the [victim's] death" other than her presence in the home. *Johnson*, supra at 843. And, unlike in *Glenn* and *Johnson*, there was no evidence here of prior abuse of the victim.

There was no evidence presented that Bell directly caused the victim cruel and excessive pain by inflicting blunt force trauma to her head; caused someone else to commit the act; aided or abetted in the act; or that she advised, encouraged, hired, counseled or procured someone to commit the act. There was nothing to exclude the reasonable possibility that she was asleep when the victim was taken from the home

30

and/or killed, and there was nothing in her actions before, during, or after the victim's disappearance and death from which the jury could make such an inference. See *James v. State*, 260 Ga. App. 350, 352-353 (1) (579 SE2d 750) (2003) (defendant's conduct before and after crimes did not support inference that he knew of plan for home invasion or that he shared the criminal intent of parties who committed the crimes). Under these circumstances, we must reverse Bell's conviction for second degree murder. See *Glenn*, supra; *Johnson*, supra; compare *Virger v. State*, 305 Ga. 281, 288-289 (3) (824 SE2d 346) (2019) (evidence showed that husband fathered child while he and wife were estranged, witnesses observed bruises on the child after the child began living with husband and wife, wife resented the child and observed husband seriously injure child and failed to seek medical attention, and wife was caught on video acknowledging some culpability in child's death; evidence was sufficient for jury to conclude that wife was a party to felony murder based on second-degree child cruelty and, in particular, to find that her and the husband's failure to seek medical aid for the child was the proximate cause of her death).

We note that the State seemingly acknowledged that the evidence was not sufficient to support Bell's conviction for causing the victim's death by inflicting blunt force trauma to her head. Unlike the arguments in the State's brief on appeal,

in closing statements at trial, the prosecutor argued that Bell gave law enforcement officers incriminating information about McNabb, "cared about getting her child back," and "was consistent about the events that happened." The prosecutor argued further, "we know that [Bell] is not involved. She is not trying to protect [McNabb]." Nevertheless, the prosecutor explained that Bell was being charged with second degree murder and second degree cruelty to children for inflicting blunt force trauma to the victim's head. Then, immediately after explaining that Bell was being charged for the cruelty of inflicting blunt force trauma, the prosecutor stated that the cruelty was "neglect. It would be drugs. It would be violence. She is accountable for her decision. She chose to bring this child into this environment."

2. *Cruelty to children in the second degree.* Because we reverse Bell's conviction for second-degree murder, her "guilty verdict for second degree cruelty to children is 'unmerged' from her conviction for second degree murder." *Castro-Moran v. State*, 356 Ga. App. 248, 252 (1) (b) (845 SE2d 708) (2020). We are therefore authorized to consider her challenge to the sufficiency of the evidence with regard to the verdict on the charge of second degree cruelty to children. See id. ("[I]f a defendant raises an issue on appeal that, on remand, would bar entry of a conviction

32

on a verdict that was merged or vacated, it is appropriate to address that issue.")
(citation and punctuation omitted).

The indictment alleged that Bell committed cruelty to children in the second degree by "caus[ing] [the victim] . . . cruel and excessive physical pain through the infliction upon her of blunt force trauma to her head, in violation of OCGA § 16-5-70 (c)." But as we held in Division 1, the evidence was insufficient to show that Bell caused the victim cruel and excessive physical pain by inflicting blunt force trauma to her head, either directly or as a party to the crime. Therefore, the evidence was also insufficient to sustain the guilty verdict for cruelty to children in the second degree.

3. *Contributing to the dependency of a minor.* With regard to Bell's conviction for felony contributing to the dependency of a minor, we find the evidence to be sufficient. Bell was charged with a violation of OCGA § 16-12-1 (b) (3), which provides that a person commits the offense of contributing to the dependency of a minor when such person "[w]illfully commits an act or acts or willfully fails to act when such act or omission would cause a minor to be adjudicated to be a dependent child as such term is defined in Code Section 15-11-2." Under OCGA § 15-11-2 (22) (A), a dependent child is one who has been neglected or abused and is in need of protection from the court. As explained in OCGA § 16-12-1 (c), it shall not be a

33

defense to the offense of contributing to the dependency of a minor "that the minor . . . has not been adjudged to be a dependent child or a child in need of services."

The indictment charged Bell with the "willfully fail[ing] to provide proper parental care or control for [the victim] . . . and fail[ing] to provide said child with adequate supervision necessary for such child's well-being, said act resulting in [the victim] being a deprived child, in accordance with the provisions of Code section 15-11-2 . . . and said act[s] resulted in the death of said child, in violation of OCGA § 16-12-1 (b) (3)." Here, the evidence showed that Bell used methamphetamine and marijuana on a regular basis including the night before the victim was taken from the home; left the eight-day-old victim along with her sister for two days with a family member who had four children of her own; told the grandfather that he could keep her children in exchange for him returning the car she was using; regularly had others in her home to use methamphetamine; and resided with McNabb, who also used methamphetamine daily, was physically violent toward her, and had recently assaulted another individual with brass knuckles. Bell herself admitted that she did not properly care for the victim and that there was drug use in the home, stating further that she was "guilty of . . . neglect because [she] did drugs." There was therefore some evidence for the jury to conclude that Bell committed acts that caused

34

the victim to be neglected[7] and in need of protection from the court. See *In the Interest of C. R.*, 292 Ga. App. 346, 349-350 (1) (a) (665 SE2d 39) (2008) (court did not err in finding child dependent where mother abused drugs before and after child was born and often left child in care of others when she went to use drugs); *In the Interest of K. W.*, 279 Ga. App. 319, 321 (631 SE2d 110) (2006) ("juvenile court is entitled to infer an adverse effect on the children when there is evidence of chronic alcohol or drug abuse by the parent"); see also *Walker v. State*, 104 Ga. App. 595, 595 (2) (122 SE2d 486) (1961) (neglect includes placing child in unfit surroundings or exposing child to immoral and depraved influences not conducive to the child's health morals or well-being).[8]

---

[7] OCGA § 15-11-2 (48) defines neglect as
(A) The failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals; (B) The failure to provide a child with adequate supervision necessary for such child's well-being; or (C) The abandonment of a child by his or her parent, guardian, or legal custodian.

[8] We note that there was no expert testimony presented in this case regarding the effects of using methamphetamine or marijuana. But in *In the Interest of K. W.*, supra at 322, we held that the inference of an adverse affect on minor children from a parent's chronic drug use,

was particularly warranted . . . where the [parent's] drug of choice was

However, because the indictment charged that Bell's "act[s] resulted in the death of [the victim]," resulting in a felony charge of contributing to the dependency of a minor, see OCGA § 16-12-1 (d.1) (1),[9] we must also consider whether her conduct carried with it the foreseeable risk of death. See, e.g., *Williams v. State*, 299

methamphetamine, a Schedule II controlled substance involving dangers to adults and children that have been well documented. See, e.g., Sharon G. Elstein, Children Exposed to Parental Substance Abuse: The Impact, 34 Colo. Law. 29, 32 (2005) (children exposed to methamphetamine use are at increased risk of victimization because the drug increases "paranoia and rage"); Zachary R. Gates, Obeying the "Speed" Limit: Framing the Appropriate Role of EPA Criminal Enforcement Actions Against Clandestine Drug Laboratory Operators, 13 Penn. St. Envtl. L. Rev. 173, 175-176 (2005) (long-term methamphetamine use is associated with "violent behavior, confusion, and insomnia, … auditory hallucinations ('the voices'), mood swings, and delusions or paranoia").

[9] A person convicted under OCGA § 16-12-1 (b) (3) shall be guilty of a felony when a violation of the statute results "in the serious injury or death of a child." OCGA § 16-12-1 (d.1) (1). We note that while the indictment alleged that Bell's acts resulted in the victim's death, it did not specifically mention OCGA § 16-12-1 (d.1) (1). Subsection (d.1) provides the level of the crime and punishment for a conviction under OCGA § 16-12-1 (b) (3) based upon whether "serious injury or death of a child" occurred and whether it is a first or subsequent offense. But the language of the indictment clearly refers to felony contributing to the dependency of a minor under OCGA § 16-12-1 (d.1) (1). And it appears that Bell was convicted of and sentenced for a felony pursuant to subsection (e) (1) as required by subsection (d.1) (1).

Ga. 632, 634-635 (791 SE2d 55) (2016) (noting that the General Assembly addressed the "foreseeable risk of death" in the contributing to the dependency of a minor statute).

We have never before analyzed foreseeable risk of death under the contributing to the dependency or delinquency of a minor statute. Indeed, in the criminal context, a foreseeability and proximate cause analysis appears most often in murder cases. See *State v. Jackson*, 287 Ga. 646, 649 (2) (697 SE2d 757) (2010) (noting that "proximate cause is the standard for homicide cases in general"); see also, e.g., *Martin v. State*, 310 Ga. 658, 661-662 (1) (852 SE2d 834) (2020) (malice murder case; foreseeability of death during armed robbery); *Treadaway v. State*, 308 Ga. 882, 884-885 (1) (843 SE2d 784) (2020) (felony murder case; foreseeability of death from assault of highly intoxicated, disabled person). But these principles may apply for any crime where it is alleged that a criminal act resulted in a death. See *Jackson*, supra at 648 (2) (explaining that "proximate cause is the standard for criminal cases in general"); see also *In the Interest of B. L. M.*, 228 Ga. App. 664, 664-665 (1) (492 SE2d 700) (1997) (applying proximate cause analysis to charge of reckless abandonment under OCGA § 16-5-72 (abandonment of child that results in death)). "In a criminal case, proximate cause exists when the accused's act or omission played a substantial part in bringing

37

about or actually causing the victim's injury or damage and the injury or damage was either a direct result or a reasonably probable consequence of the act or omission." *Skaggs v. State*, 278 Ga. 19, 19-20 (1) (596 SE2d 159) (2004) (citations and punctuation omitted). It "imposes liability for the reasonably foreseeable results of criminal . . . conduct if there is no sufficient, independent, and unforeseen intervening cause." *Jackson*, supra at 654 (3).

However, "proximate cause is a jury question." *Dunagan v. State*, 283 Ga. 501, 505 (661 SE2d 525) (2008). And there was some evidence here for the jury to conclude that there was a "foreseeable risk of death" to the victim from Bell's neglect that included placing the victim in an environment of methamphetamine and violence. There was evidence of violence in the home before and after the victim was born, and Bell herself admitted that McNabb had people "in and out" of the house. Bell used methamphetamine and marijuana on a regular basis and allowed McNabb and others to do the same in her house, including the night before the victim disappeared. Although Bell's acts of neglect were not the sole proximate cause of the victim's death, the evidence was sufficient for the jury to conclude that those acts played a substantial part in her death and that death was a reasonably probable consequence of that neglect. See *Williams v. State*, 298 Ga. 208, 213-214 (2) (b) (779 SE2d 304)

(2015) (child victim died from cocaine ingestion; felony murder predicated on possession of cocaine with intent to distribute affirmed where defendant hid cocaine in a hole in living room sofa within the reach of his young children, creating a foreseeable risk of death); *Skaggs*, supra (proximate cause includes when the accused's act played a substantial part in bringing about the victim's injury and the injury was a reasonably probable consequence of the act); *In the Interest of B. L. M.*, supra (finder of fact authorized to find that although child's exposure to the elements was not the sole proximate cause of death, mother's act of abandonment materially contributed to or accelerated child's death). We therefore affirm Bell's felony conviction for contributing to the dependency of a minor under OCGA § 16-12-1 (d.1) (1).[10]

*Judgment affirmed in part and reversed in part. Dillard, P. J., and Pinson, J., concur.*

---

[10] Bell also asserts that there was a fatal variance between the indictment and the proof at trial. However, the particular fatal variance argument she asserts is duplicative of her challenge to the sufficiency of the evidence. In any event, a fatal variance claim would be waived as Bell did not raise it in the trial court. See *Hughes v. State*, 310 Ga. 453, 456 (2) n.5 (851 SE2d 580) (2020).